MRS. M. H. SCOTT *v.* UNION & PLANTERS' BANK & TRUST
COMPANY *et al.*

(*Jackson.*    April Term, 1910.)

1. **GIFTS CAUSA MORTIS.** Defined to be gifts made in anticipa-
   tion of donor's speedy death to be effective upon the death.

   A gift *causa mortis* is a gift, absolute in form, made by the donor
   in anticipation of his speedy death, intended to be effective and
   operative only upon the happening of his death; and between
   the time of the making of the gift accompanied by the delivery
   of the thing given and the time of the donor's death, the gift
   is wholly inchoate and conditional. The gift must be absolute,
   with the exception of the condition inherent in its nature de-
   pendent upon the donor's death; and delivery of the thing
   given is essential. (*Post, p.* 271.)

2. **SAME.** Delivery to the donee or his agent is essential, though
   it may be actual or constructive.

   Delivery of the thing given is essential to the validity of the gift.
   The intention to give must be accompanied by a delivery, and
   the delivery must be made with an intention to give. The
   delivery may be made directly to the donee, or to an agent or
   trustee on his behalf, but not to the donor's agent, and the
   delivery may be actual or constructive. (*Post, pp.* 271, 272.)

   Cases cited and approved: McEwen v. Troost, 1 Sneed, 186;
   Gass v. Simpson, 4 Cold, 288; Sheegog v. Perkins, 4 Bax., 273;
   Davis v. Garrett, 91 Tenn., 147; Marshall v. Russell, 93 Tenn.,
   261; Balling v. Trust Co., 110 Tenn., 288; Shugart v. Shugart,
   111 Tenn., 179; Cochran v. Moore, 25 Q. B. D., 57; Ward v.
   Turner, 2 Ves., Sr., 431, Leading Cases in Equity, vol. 1, p.
   *721, Notes by White & Tudor and by Hare & Wallace;
   Johnson v. Stevens, 22 La. Ann., 144; Hansom v. Millett, 55
   Me., 184; Hatch v. Atkinson, 56 Me., 324; Egerton v. Egerton,
   17 N. J. Eq., 419.

Scott v. Bank.

3. **SAME. Same. Constructive delivery sufficient to take the place of actual delivery is defined.[1]**

The "constructive delivery" sufficient to take the place of actual delivery, essential to make a gift *causa mortis,* must completely terminate the donor's custody and control of the thing given, and must place it wholly under the power of the donee and enable him, without further act of the donor, to reduce it to his own manual possession. (*Post, pp.* 272-283.)

Cases cited and approved: Farrar v. Bridges, 5 Humph., 411; McEwen v. Troost, 1 Sneed, 186; Saunders v. Harris, 1 Head, 186-205; Sheegog v. Perkins, 4 Bax., 273; Ledgerwood v. Gault, 2 Lea, 643; Swiney v. Swiney, 14 Lea, 320; Davis v. Garrett, 91 Tenn., 147; Marshall v. Russell, 93 Tenn., 261; Wilson v. Winters, 108 Tenn., 398; Royston v. McCulley, 59 S. W., 775, 52 L. R. A., 899 (Court of Chancery Appeals); Weber v. Christen, 121 Ill., 91; Weaver v. Weaver, 182 Ill., 287; In re Schmidt's Estate, 56 Minn., 256; Murphy v. Bordwell, 83 Minn., 54; Fletcher, 55 Vt., 325; Ross v. Draper, 55 Vt., 404; Estate of Malone, 13 Phila. (Pa.), 313; Stephenson v. King, 81 Ky., 425; Grymes v. Hone, 49 N. Y., 17; Curtis v. Bank, 97 Me., 151.

4. **SAME. Same. Same. Delivery depends largely upon the intention of the parties.**

The question of what will amount to legal delivery, essential to constitute a gift *causa mortis,* depends on the intention of the parties. The real test of delivery is, did the donor, by his acts or words or both, intend to divest himself of the custody and control of the property given, and place it wholly under the power of the donee, and, if he did, there was a sufficient delivery. (*Post, pp.* 274-283.)

Cases cited and approved. See the citations under the preceding headnote.

5. **SAME. Sufficiency of evidence to establish; intention to make the gift, and all possible done to make delivery, the gift will be sustained.**

---

[1] As to the sufficiency of constructive delivery to sustain gift *causa mortis,* see note to Page v. Lewis (Va.), 18 L. R. A. 170.

Scott v. Bank.

While the courts will scrutinize with care the evidence upon which a gift *causa mortis* is sought to be sustained, and will require clear and convincing proof; yet, when the court has once ascertained that it was the intention of the donor to make such gift, and all was done which was possible under the circumstances in the matter of delivery, the gift will be sustained. (*Post, pp.* 283, 284.)

6. SAME. Testimony that the donor gave the thing to the donee is not a mere conclusion, but a characterization of the act completing the donor's intention.

The statement of a witness testifying to facts in support of a gift *causa mortis* of a bank certificate of deposit that the donor gave the certificate to the donee is not a mere conclusion, but the statement simply characterizes the act by which the intention of the donor was completed. (*Post, pp.* 285, 286.)

7. EVIDENCE. Cross-examination as to incompetent testimony without waiving objection; but objection is waived by causing witness to repeat the incompetent testimony.

While a cross-examination as to incompetent testimony admitted over objection may be made without waiving the objection, yet a cross-examiner who causes the witness to repeat such incompetent testimony in his cross-examination cannot still rely upon his original objection. (*Post, pp.* 287, 288.)

8. GIFTS CAUSA MORTIS. Evidence stated and held sufficient to show.

In a suit to establish a gift *causa mortis*, the evidence stated is held to show that the donor was mentally competent to make the gift. (*Post, pp.* 290-293.)

9. SAME. Evidence stated and held to show no fraud or undue influence.

In a suit to establish a gift *causa mortis*, the evidence stated is held to show no fraud or undue influence inducing the gift. (*Post, pp.* 293-295.)

10. SAME. Presumption of acceptance; and evidence of acceptance is immaterial.

Scott v. Bank.

The law presumes the acceptance of a gift *causa mortis*, so that evidence of the donee that he accepted the gift is immaterial. (*Post, pp.* 295, 296.)

Cases cited and approved:. Barnard v. Thurston; 86 Minn., 343; Ammon v. Martin, 59 Ark., 191; De Levillain v. Evans, 39. Cal., 120.

11. Same.   Facts held sufficient to constitute a gift causa mortis of a bank certificate of deposit.

The donor of a bank certificate of deposit indorsed it in the presence of witnesses, and gave it to the donee in contemplation of death, and the donee indorsed it, and a third person went, at the request and direction of the donor and donee, to cash it, but the donor died prior to the bank's payment of the certificate.   These facts were held to constitute a gift *causa mortis*. (*Post, pp.* 289-296.)

12. SAME.   Facts held sufficient to constitute a gift causa mortis of bonds in a bank vault by order for them.

The owner of bonds in a bank vault executed an order in writing, directing the bank officials to give the party named in the order access to the bank vault or to deliver to him the contents of the vault, with direction to such party to give the bonds therein to the donee.   The gift was made in contemplation of the death of the donor, who died before the bonds were obtained from the vault.   These facts were held to constitute a gift *causa mortis*.   (*Post, pp.* 289-296.)

13. SAME.   Donee's mistake as to rights cannot affect his legal relation to the gifts.

The donee's mistake as to his right under gifts *causa mortis* cannot affect his legal relation to them.   The fact that the donee caused a will to be prepared for the donor to execute, in which his various relatives were provided for, while the residuum of the estate was given to the donee will not deprive the donee of such gifts, where the will was not executed, and especially where the donee's explanation entirely relieves him, and makes this effort of his entirely innocent.   (*Post, pp.* 296, 297.)

FROM SHELBY.

Appeal from the Chancery Court of Shelby County. H. DENT MINOR, Chancellor.

FITZHUGH & BIGGS, for complainant.

LEHMAN, GATES & LEHMAN, and W. G. LYNN, for defendants.

MR. CHIEF JUSTICE BEARD delivered the opinion of the Court.

The bill in this case was filed by complainant to have established by decree of the court two gifts, alleged to have been made to her, in his last illness and in contemplation of death, by her deceased brother, J. C. Marley. The subjects of these gifts were a certificate of deposit issued by the defendant bank to the deceased for $125,937. 51, and $50,500 par value of United States three per cent. coupon gold bonds on deposit in a safety box, rented by the deceased and located in the vault of that bank.

As originally filed, only the depositary, the Union & Planters' Bank & Trust Company, and Joe M. Scott, the administrator of the deceased, were made parties defendant to the bill. As to the certificate of deposit, the bill averred that on the 11th of May, 1909, the day before his death, the deceased "gave the complainant

the aforesaid certificate of deposit, by indorsing his name on the back thereof, and having his indorsement witnessed by Messrs. C. R. Barbee and C. M. P. Partee, two highly respected citizens of Ripley, Tenn. . . . This certificate, after he had indorsed it, he gave to complainant, and she then indorsed it and gave it to the defendant Joe M. Scott, who brought it to Memphis, Tenn., for collection for her and presented it to the defendant bank and trust company. . . . Instead of paying the amount in money to him, at the request of the defendant Scott, it issued to complainant its cashier's check, payable to her, . . . on the morning of May 12, 1909."

As to the gift of the bonds, it was alleged that: "At the time the gift of the certificate of deposit was made to complainant, the deceased gave her the contents of his box, in the vault of defendant bank. For this purpose he requested his nephew, the defendant Joe M. Scott, to write an order to Mr. S. P. Read, president of the Union & Planters' Bank & Trust Company, which order was signed by Capt. Marley and witnessed by Messrs. Barbee and Partee, and is in the following words and figures:

"'Ripley, Tennessee, May 11th.

"'Mr. S. P. Read, Memphis, Tenn.—Dear Sir: This will be handed you by my nephew, Joe M. Scott, and he has the key to my box in your vault, and I want him to get some papers that I have in it.

"'[Signed]     Joe C. Marley.

"'Witnesses:  C. R. Barbee.  G. M. Partee.'

"The deceased also gave to Mr. Scott the key to this box and directed, as trustee for complainant, to take from his box all of its contents and deliver the same to said complainant, to whom deceased gave all the contents of said box. . . . On the morning of May 12th, Mr. Scott carried the above order to Mr. S. P. Read, who admitted him to the private box of Capt. Marley, and Mr. Scott took therefrom its contents, to wit, the United States coupon bonds, . . . and these bonds were delivered to complainant, and are now in her possession."

In answering this bill, the defendant Scott, while conceding that the physical facts alleged therein, as to the certificate of deposit, took place, denied that there was a completed valid gift, either of it or of the fund represented by it on deposit in the defendant bank. As to the order for the bonds, the averment of the answer is as follows: "He (respondent) admits that the order set out in the bill, addressed to the president of the said Union & Planters' Bank & Trust Company, was written by him and signed by Joe C. Marley, and witnessed, . . . and at the time certain instructions were given to the respondent by the said Joe C. Marley. The words, as near as this respondent can now state, are as follows: 'Take the key and go bring the bonds and everything in the box, and give to your mother.' "

While admitting this much, yet, it is averred that title to these bonds was not vested in the complainant,

as there was lacking the ingredient of delivery as con-templated by law.

The defendant Joe M. Scott, while administrator of the estate and making these qualified denials, was the son of complainant. And so it was that certain dis-tributees of the deceased, believing that his defense of this case would be merely colorable, denying the legal efficacy of the matters in question to confer title upon the complainant, asked leave, and were permitted, to become defendants in the cause. Thereupon they filed an answer in which they put in issue every matter of fact upon which complainant sought to maintain a claim to the property in question.

Upon the hearing of the cause, the bill of complain-ant was dismissed. From this decree of dismissal the case has been brought to this court by the complainant for review.

To an intelligent determination of the issues, we deem it necessary to set out with some detail those facts of a historic nature which led up to the incidents out of which this controversy grows. Capt. Joe C. Marley died on the 12th of May, 1909, at the advanced age of eighty-one years. He was one of seven children, five of whom were of the half blood, and the other, the com-plainant, being of the whole blood. All of this family predeceased him, save the complainant and an aged half-brother, Hampton W. Marley, who, with his fam-ily, had resided for many years in the State of Texas. Two of his half-brothers and a half-sister left children,

who as parties defendant are now contesting the claim set up by complainant in her bill.

That the most intimate and affectionate relations existed between Capt. Marley and his sister is abundantly shown. Married but a few months, he remained a widower from his wife's death, in 1871. He lived and died childless. For many years his home was in or near Ripley, in this State, and near that of complainant. For the last seventeen years of his life, he was a member of her household, where in health he received continued marks of consideration and sisterly love from her, and in illness was nursed by her "as if one of her children." On the other hand, he never failed, by act or word, to express his devotion to her, and the record well justifies the statement of her counsel "that he attempted at all times to shield her from every worry; that he never allowed her to want for anything that was in his power to give, or to do." For twenty years prior to his death, Mrs. Scott was a widow, and her bereavement and his own solitary life, no doubt, brought them more closely together. As it was, some of her children and grandchildren grew up, as it were, "around his knee," and they, as was the complainant, were the objects of his solicitude. As an indication of his great regard for complainant and a seeming purpose to make provision for her old age, during a financial disturbance which occurred some time before the transactions here involved, he gave to her $10,000 in gold coin, and about 10 days before his death he had brought from

Memphis coupon bonds of the value of $37,000, and, carefully wrapping them in paper, he called her to him, and when placing the package in her hands, said to her that the contents were a gift from him and were her property.   As a further mark of his affection for her, which was evidently far beyond that entertained by him for any other of his kindred, the testimony of Joe M. Scott is that years before his uncle's death, and during his last fatal illness, Capt. Marley stated to him that he had made a will giving his mother everything, but in these last conversations he stated he did not know where it was.

While such were the relations existing between this brother and sister, and such his affection for her children and grandchildren, Capt. Marley was by no means destitute of regard for others of his kinspeople.   The record contains a number of letters from Capt. Marley to his old half-brother in Texas, running down to a little while prior to the death of the former, in all of which he expresses strong fraternal affection for him. This half-brother, nearly ninety years of age, during the last few years prior to Capt. Marley's death received from him and his abundance without request, at different times, about $4000.   To nephews and nieces he was equally kind, if not as generous, and in some of them he manifested a very kindly interest.

In the fall of 1908, Capt. Marley was afflicted with grippe, which was followed, in January, 1909, by an attack of bronchial pneumonia.   The effect of these ill-

nesses was that he was left in a badly enfeebled condition. Dr. Lackey, an accomplished physician of Ripley, attended him during this latter attack. He visited Capt. Marley from January 19th to the 31st of that month, when he ceased his attentions and was only recalled on April 7th, following. From this time until his death he was with him and ministered to him daily. He testifies that, in the interim between the two dates last mentioned, Capt. Marley's case was one simply of suspension, and that his last attack was the "result of the bronchial pneumonia. His lungs did not heal up, and it was but a continuation of the first attack." On Saturday night, May 8, 1909, or about 12:30 a. m. Sunday, May 9th, according to this witness, Capt. Marley had a cerebral hemorrhage, brought about by the weakened condition of his general organism, including his arteries, exaggerated by his great age. This hemorrhage produced what this physician denominates a "storm" for about twelve hours in Capt. Marley, accompanied by nervousness to such a degree that sedatives were administered to quiet him, and paralysis of his left side, disabling him from moving himself. At the time of this attack and for a week or more before, he had not sat up, but required to be propped in bed. That his condition was regarded as alarming, we think, is evidenced from the fact that Dr. Lackey spent the night of May 8th at Mrs. Scott's, and that this apprehension did not abate is shown in the further fact that he also spent the nights of May 10th and 11th with

Capt. Marley. He testifies that he did this because "they (Mrs. Scott and family) were uneasy about him," and that he was equally so. In the course of his cross-examination, he was asked this question. "You were expecting his death at any moment?" And his answer was: "Any moment, . . . yes, sir, might be. You might expect his death at any moment under these conditions." And he states that of this the complainant and her family had knowledge. Beyond doubt, the effect of the paralytic stroke remained with the deceased until his death, and to sustain him strychnine and digitalis were administered. Dr. Lackey further testified that, in the course of the evening before Capt. Marley was paralyzed, he had a conversation with the complainant and also the defendant, her son, about "the Captain writing a will," and then told them "they had better see after his business."

As has been already stated, Dr. Lackey spent the nights of Monday 10th and Tuesday the 11th of May with Capt. Marley. He testifies that on the morning of the 11th he "told them (the family) they had better not bother him, . . . to keep them (the people) out," and in fact "had told them that several times before. . . . That company seemed to worry him. . . . He would talk. . . . He would do all the talking." He further testifies that, having left in the early hours of the morning, he revisited Capt. Marley about 11 o'clock of Tuesday, the 11th of May, "when he (the deceased) seemed to be all right. He spoke to me.

He knew me just as he had been doing. I asked him
how he was feeling, and he said very well, and he shook
hands with me and said he wanted to see me and Mr.
Reed Barbee on some business, and I just simply told
him we would arrange it." He further testified that
in his opinion Capt. Marley was then "in his right
mind."

Leaving about 12 o'clock, this witness returned to
the house of Mrs. Scott that evening (the 11th), "after
dark," and found that Capt. Marley "had weakened
very rapidly from the time" he "saw him previously;"
that is, from 11 to 12 o'clock of that day. On this last
visit he found his patient unconscious, and in this con-
dition he remained until his death, which occurred at
5 o'clock and 20 minutes the next morning. The al-
leged gifts which are the subject of the present litiga-
tion, it is claimed, were made between 12:30 and 1:30
p. m. on Tuesday the 11th of May, a very few hours
before Dr. Lackey, on his return, found Capt. Marley
in a state of stupor. How long this condition existed
before this last visit of the doctor the record does not
disclose.

Before detailing the circumstances surrounding this
transaction, we think it proper to consider the princi-
ples which we understand the courts regard as controll-
ing in the matter of "gifts *causa mortis.*" In doing
this we will not undertake to review, or even refer to,
all of the many authorities collated and commented on
by the respective counsel in this case, but will content

ourselves with a reference to those which we regard as stating distinctly these principles.

We know of no better definition of such a gift, or of the principles governing courts in considering it, than is found in section 1146, vol. 3, of Mr. Pomeroy's admirable work on Equity Jurisprudence. The text is as follows: "A donation *causa mortis* is a gift absolute in form made by the donor in anticipation of a speedy death, and intended to take effect and operate as a transfer of the title upon, and only upon, the happening of the donor's death. Between the time when the gift is made and the article donated is delivered, and the time when the donor died, the donation is wholly inchoate and conditional. . . . The gift must be absolute with the exception of the condition inherent in its nature dependent upon the donor's death, . . . . and the delivery of the article donated is a necessary element. . . . Although courts do not lean against gifts *causa mortis,* yet the evidence to establish them must be clear and unequivocal, will be closely scrutinized. The burden of proof lies on the donee."

In section 1149 of the volume of Mr. Pomeroy already quoted, the author, returning to the subject of "delivery," says: "It is essential to the validity of a donation that the thing given be delivered to the donee, or to his use. Without a delivery the transaction would only amount to a promise to give, which, being without consideration, would be a nullity. The intention to give must be accompanied by a delivery, and the de-

livery must be made with an intention to give. . . .
The delivery may be made directly to the donee, or to
an agent or trustee on his behalf; but not to an agent
of the donor. It may be actual . . . or construc-
tive. A constructive delivery must be something which
completely terminates the donor's custody and control
of the article donated and which places it wholly un-
der the donee's power, and enables him without further
act on the donor's part to reduce it to his own manual
possession. All the cases which hold a constructive
possession to be good, whatever be their special circum-
stances, will be found to conform to this criterion; that
the donor parts with all control and power of exercising
dominion, while the donee obtains the exclusive power of
taking physical possession and custody of the article, so
that it is in fact placed under his sole dominion."

Possibly the leading case in England and America
on this subject is that of *Ward* v. *Turner,* 2 Ves., Sr.,
Rep., 431, reproduced in Leading Cases in Equity, vol. 1,
*p. 721, in which Lord Hardwicke discussed the
doctrine on principle and authority in a most exhaus-
tive manner. After a learned review of the civil law,
as well as of the English authorities, he concludes that,
"from all these cases, the consequence is that by the
civil law, as received and allowed in England, tradition
or delivery is necessary to make a good donation *causa
mortis.*"

Many English and American cases are found in White
& Tudor's and Hare & Wallace's Notes, approving the

soundness of the principal case.　These cases hold, as we understand them, that delivery is not only essential, but by this act of parting with possession the donor should also part with all dominion over it.

Among the American cases holding that delivery is essential to a gift *causa mortis,* as well as *inter vivos,* is *Johnson* v. *Stevens,* 22 La. Ann., 144; *Hanson* v. *Millett,* 55 Me., 184; *Egerton* v. *Egerton,* 17 N. J. Eq., 419; *Hatch* v. *Atkinson,* 56 Me., 324, 96 Am. Dec., 464.

This has been the settled rule in this court.　In *McEwen* v. *Troost,* 1 Sneed, 186, where the question arose upon a gift of chattels by deed, it was said: "Delivery is essential to the validity of a parol gift of a chattel or chose in action, whether it be a gift *inter vivos,* or *causa mortis;* and without delivery and a transfer of the possession, the title does not pass to the donee."

The delivery may be made to a third person, but it must be for the donee.　So it was said in *Marshall* v. *Russell,* 93 Tenn., 261, 25 S. W., 1070: "If the delivery to the third person is simply for the purpose of delivery to the donee as agent or messenger of the donor, the gift is not complete until the subject of the gift is actually delivered to the donee. . . . When the delivery to a third person is to him in the capacity of trustee of the donee, and not as agent of the donor, such delivery completes the gift.　To constitute such a case the circumstances should show a full relinquishment of dominion over the property to the trustee for the purpose of the trust, say that the trustee shall not

be the agent of the donor, but shall act for the donee instead." To the same effect are *Balling* v. *Trust Co.,* 110 Tenn., 288, 75 S. W., 1051; *Sheegog* v. *Perkins,* 4 Baxt., 273; *Shugart* v. *Shugart,* 111 Tenn., 179, 76 S. W., 821, 102 Am. St. Rep., 777.

In the argument submitted for the appellant by her counsel, it is urged that: "Delivery is only evidence of the gift, and this may be shown quite as conclusively in other ways. It may arise by implication."

So far as our examination extends, this proposition, thus broadly stated, is not sound. It is true that, in *Gass* v. *Simpson,* 4 Cold., 288, it is said "delivery strengthens the evidence of the gift," and in other cases expressions are found like the following: "Delivery emphasizes the gift" yet all agree that "delivery is essential to the gift." In speaking of the English rule, in *Cochran* v. *Moore,* 25 Q. B. D., 57 (1890), the Master of the Rolls said: "Upon long consideration, I have come to the conclusion that actual delivery in the case of a 'gift' is more than evidence of the existence of the proposition of law which constitutes a gift, and I have come to the conclusion that it is a part of the proposition itself." But the question of law remains: What is delivery? Is it manual tradition alone, or will the law be satisfied with a symbolical, or, using a word of broader meaning, constructive, delivery?

This court has had occasion a number of times to consider the elements essential in the matter of "delivery." In *Farrar* v. *Bridges,* 5 Humph., 411, 42 Am. Dec., 439,

it is said that "A formal, ceremonious delivery of a deed is not essential to its validity, if no condition be annexed, if nothing remains to be performed in order to give effect to the instrument, its signing, sealing, and attestation as a valid instrument between the parties will make it complete and effectual, although the instrument may be left in possession of the bargainor or grantor." In *Saunders* v. *Harris*, 1 Head, 186-205, again it is distinctly announced that, where the execution of the instrument for the purposes intended is distinctly established, proof of the formal delivery is not important. In *Ledgerwood* v. *Gault*, 2 Lea, 643, there was involved a deed of gift from a father to a son, upon certain conditions, which were imposed upon the grantee; the record showing that when the instrument was executed and witnessed it was retained by the grantor. As to the necessity of delivery, the court said: "In the case of an ordinary deed of conveyance, the retaining possession of the deed by the grantor would be a strong circumstance against the presumption of a delivery; but even in such a case it would not be conclusive, as a delivery does not necessarily consist in the actual transfer of the paper from one party to the other, if the deed be fully executed and witnessed, and nothing further remains to be done by either party, as a condition upon which it is to take effect. In other words, if the circumstances all indicate that it was the intention of the parties that the deed was to take immediate effect, then the delivery would be regarded as complete, although the actual custody remain with the grantor."

It is true, in that case, the grantee, by reason of the conditions imposed upon him, signed the deed', yet, while it is stated in the opinion that this made it not improper for the grantor to retain the deed in question, still it was observed by the court, this only furnished a stronger reason why the rule, stated above, should apply.

In *Davis* v. *Garrett*, 91 Tenn., 147, 18 S. W., 113, it is said: "Delivery of a deed is undoubtedly essential to its due execution. But it has been repeatedly held that the delivery need not be formal, or into the hands of the grantee, or some one for him, if the circumstances are such as to make it clearly appear that the intention of the maker was that the deed should take effect without delivery." After reviewing a number of cases, the decision was placed upon the intention of the grantor, as interpreted by his acts. On this point it was said: "The act of registration upon direction of the grantor is highly significant of his purpose to give effect to his deed. . . . It ought to require strong circumstances to rebut the presumption of the delivery arising from such conduct."

In *Marshall* v. *Russell*, 93 Tenn., 261, 25 S. W., 1070, the court held that in proving delivery the circumstances of the transaction should be considered, and in *Wilson* v. *Winters*, 108 Tenn., 398, 67 S. W., 800, the court recognized that there might be legal delivery of a deed, though the grantor retained possession of it.

In *McEwen* v. *Troost*, supra, there was a gift by the donor, to two of his children, of a valuable library and

Scott v. Bank.

of a large collection of natural and scientific specimens, evidenced by deed spread upon the register's records at the instance of the donor. These articles of personal property remained in the possession and under the control of the donor up to the time of his death. The controversy in that case was as to whether this gift was effectual in law, and it was held that it was. The opinion in the case states that a few days before the death of the donor he recognized the existence of this deed and declared his purpose that it take effect. The donees assented to and claimed the benefit of the gift, and it was held by the court that "from the facts might be inferred a delivery and acceptance in the absence of any proof of a formal delivery."

It will be seen that these and other of our cases make the question of legal delivery depend largely upon the intention of the parties. In *Swiney* v. *Swiney,* 14 Lea, 320, it was announced, as was done before, and has been frequently since, that what will amount to a delivery is a question of intention; the court saying: "Other cases settled the principle that whether the mere execution and delivery to the register for registration will amount to a delivery is a question of intention." And in *Sheegog* v. *Perkins,* supra, where the validity of a gift *causa mortis* was presented, the court in its opinion collated "the stronger points of the testimony bearing upon the question involved" in order to give the complainant the benefit of the whole case in ascertaining the intention of the donor in the transaction in question. Treating this

as pivotal, the court said: "The question in any event resolves itself into one of intention." Upon an examination of authorities outside of the State, it will be found that this is the prevailing doctrine. In *Weaver* v. *Weaver*, 182 Ill., 287, 55 N. E., 338, 74 Am. St. Rep., 173, where was in controversy an alleged gift *inter vivos* of a policy of life insurance, the court said: "The usual mode of delivery is the manual transfer from the grantor to the grantee. But it is too well understood to call for the citation of authorities that the declarations and conduct of the grantor in relation to the instrument may be such as to become equivalent to such actual delivery, and in every such case the crucial test is the intent with which the acts or declarations are made; and that intent is to be ascertained from the conduct of the parties, particularly the grantor, and all the surrounding circumstances of the transaction." In *Weber* v. *Christen*, 121 Ill., 91, 11 N. E., 893, 2 Am. St. Rep., 68, it is said: "Delivery is by words and acts, or both combined, by which a grantor expresses a present intention to divest himself of title to property, described in a proper deed. No particular form of delivery is required. A deed may be manually given by the grantor to the grantee, yet manual delivery is unnecessary. The real test of delivery is this: Did the grantor by his acts or words, or both, intend to divest himself of title; if so, the deed is delivered"—citing 9 Am. and Enc. Cyc. of Law (2d Ed.), 153, and other authorities.

In *Murphy* v. *Bordwell*, 83 Minn., 54, 85 N. W., 915,

Scott v. Bank.

52 L. R. A., 849, 85 Am. St. Rep., 454, the court sustained a gift of a deposit in a bank, without change of same on its books. It appears that the mother, to whose credit the money was deposited, desired to give the same to her daughter. The cashier wrote a power of attorney from the mother to the daughter authorizing the latter, in the former's name, to draw checks upon the bank at any time and for any amount. Both the mother and daughter understood this instrument as having been executed to carry out the former's purpose of a gift. The cashier who wrote the instrument, however, knew nothing of this purpose and made no change in the account. Thereafter checks were drawn upon the bank by the donee, signing the same with her mother's name by the donee as agent. In a controversy between the mother's creditors and the donee, it was insisted that there was no delivery of the fund in the bank to the donee, or acceptance by her—"that the intention to make a gift had not been consummated." There was no evidence of fraud upon the part of the mother in making the gift. The simple question was "whether enough was done by the mother to constitute a delivery of the gift and acceptance by the daughter." As to this the court said: "While it is true that a promise or intention to make a gift in the future without act to effectuate will not constitute a donation, yet any substantial act upon the part of the owner of the property, tending to carry the gift into effect and give the donee dominion over the property, so she can appropriate it to her use, will, in

the absence of such fraud, support such gift." 2 Schouler on Personal Property, 92; *Fletcher* v. *Fletcher,* 55 Vt., 325; *Ross* v. *Draper,* 55 Vt., 404, 45 Am. Rep., 624; *Estate of Malone,* 13 Phila. (Pa.), 313; *In re Schmidt's Estate,* 56 Minn., 256, 57 N. W., 453.

While the credit of the mother was not changed on the books of the bank, yet the power of attorney and the delivery of the check book to the daughter and her use and appropriation of a part of the money so drawn from the bank, according to the intention of the mother, were acts by which her authority to draw the whole sum, either then or thereafter, from the bank, completed the gift.

In *Stephenson's Adm'r* v. *King,* 81 Ky., 425, 50 Am. Rep., 172, the facts were that Mrs. Stephenson was the owner of a note of $5500 and of a county bond of the face value of $500, both of which were in the possession of one King, as her agent. A little while prior to her death, King had written a letter to Mrs. Stephenson, in which he described this note and bond referred to. This letter was in Mrs. Stephenson's writing desk, and to this desk she gave her mother the key, before she died, and told her everything in the desk was hers, and the day before she died she requested her mother to bring her the writing desk, which, when done, she opened, and, taking out the letter from King, told her that this would show the property which the intestate had in Louisville. The court held that this was a gift of the note and bond, consummated by a constructive

delivery, the only method possible under the existing circumstances. On this point, it is said: "In the present case, the intention to make the gift long before it was made is established by undoubted testimony. The motive for making it is equally well established, and the delivery of the key of the desk, and the actual delivery of the letter from King, containing a full description of the note and bond held by the agent, the only evidence the intestate had of his possession for her use, is a sufficient delivery to make the gift complete."

In *Grymes* v. *Hone,* 49 N. Y., 17, 10 Am. Rep., 313, the donor, then about eighty years of age and in failing health, made an assignment of shares of bank stock to his granddaughter. After this had been done he kept it in his possession for a while, but afterward handed it to his wife to put with his will and other papers in a tin box. In doing this, he said to his wife: "I intend this for Nellie. If I die, don't give this to the executors, . . . give it to her herself." At the time of the transaction, not only was the donor greatly advanced in age, but in failing health, and continued so until his death. Upon these facts the court held that it was a valid gift *causa mortis.*

In *Curtis* v. *Portland Savings Bank,* 77 Me., 151, 52 Am. Rep., 750, the facts were that the plaintiff, by direction of her aunt, took the key from the bureau drawer, unlocked a trunk, and took therefrom a savings bank book, when the aunt said to her, "Now keep this, and if anything happens to me bury me decently and put a

headstone over me and anything that is is left is yours." This was held to constitute a valid gift *causa mortis*.

Cases similar to these might be multiplied indefinitely; but no stronger would any of them be found than that of *Royston* v. *McCulley*, 59 S. W., 775, 52 L. R. A., 899. This case was decided by the court of chancery appeals, and the decree of that court was afterwards affirmed by this court. Among the questions presented in the case were two pertinent to the present litigation. One of these questions was as to a $1200 note which was indorsed by the payee to a Miss Caywood. The controversy as to this, as well as to the other matter, which will be later mentioned, occurred in the administration of the estate of this payee. It was insisted, notwithstanding the indorsement to her, that it did not become her property, by reason of the fact that it was not delivered to Miss Caywood during the lifetime of the payee. The facts were, this lady had been in the family of the payee for a great many years. On account of his attachment to her, and of her devotion to him and to his entire family, at one time the payee intended to deed her one of his farms, but, subsequently, abandoned this purpose, because he concluded that its management would be neither suitable nor convenient for her. Afterwards he took the note in question and told her that he gave it to her, and, as has been already stated, did indorse it to her. There was never a manual delivery of this note to Miss Caywood during the lifetime of the payee. At his death it was found among his papers.

Scott v. Bank.

Notwithstanding this, upon the facts just recited, the court of chancery appeals said: "Living in the family with him as its head and as her protector, the note was allowed to remain in his possession. It is fairly inferable, from the whole evidence, that after its gift to her, and its indorsement by him to her, he retained it as agent and for her. Under this state of facts the gift was complete, both as a matter of fact and in law."

The other controversy in the case was as to certain bank certificates. As to this it appears that the donor said to the donee's father, a day or two preceding the former's death, to unlock a trunk, containing his pocketbook and papers, or bankchecks and bank certificates, and to indorse these to the donee, his nephew. The wittness obeyed these instructions by getting the key and unlocking the trunk. The witness took out the pocketbook, and while he had it in his hand a third party came into the room. The donor, not desiring that this person should know what he was then doing, told the witness to put the pocketbook out of sight. There was no further attempt at delivery, but the wittness was instructed to indorse the notes to the donee. Under these facts, the court held that the gift was a perfected one.

An examination of the modern cases all show, while courts will scrutinize with care the evidence upon which gifts *causa mortis* are sought to be sustained, and will require in every case clear and convincing proof, yet, when it is once ascertained that it is the intention of

the donor to make such a gift, and all is done which is possible under the circumstances in the matter of delivery, the gift will be sustained.

We will turn now to the record, with the view of determining, in the light of the authorities, whether the complainant has made out her case by "clear and unequivocal proof." If so, she is entitled to a reversal of the chancellor's decree; otherwise, not. In doing this, so much of the testimony of the complainant, as was specifically excepted to and excluded by the court below, upon the ground that it was incompetent under section 5598 of the (Shannon's) Code, will not be considered, as we are satisfied with the ruling in regard thereto. We will, in reviewing the record, refer, if necessary, only to such parts of her deposition, bearing on the issue, as were unexcepted to.

As has been seen, the claim is that these gifts *causa mortis* were made by Capt. Marley to his sister soon after the noon hour of May 11th. Mr. Joe M. Scott, in answer to a question, testifies with regard to what then occurred, as to the certificate of deposit, as follows: "The day before he died, between 12 and 1 o'clock my mother and myself were in his room, and he told me to get that certificate of deposit out of his safe, and that he wanted to give it to my mother. I asked him if he thought he could write his name on it, and he said, 'Yes,' he knew he could; so I got the certificate. He was lying down on his back, and I gave him a pen and ink, and a piece of cardboard, and he asked for his

'specks,' and I gave them to him, and he wrote his name, on the back, and, after writing his name, he told me it was so badly written he was afraid we might have trouble with it, and I had better call a witness or some witnesses. . . . I started out of the room with the intention of calling Mr. Barbee, knowing that he was a personal friend of Capt. Marley's. Before I got to the door, he said, maybe I had better call a notary to take his acknowledgment, and, knowing Mr. Partee to be a notary, I called him . . . and told him to get Mr. Barbee and bring him out."

As to the bonds, which the record shows were in a box in the safety vault of the Union Bank & Trust Company, of Memphis, rented by Capt. Marley, the witness testified as follows: "When he (the deceased) told me he wanted to give my mother the certificate, he said he wanted to give her the money in the vault down there, and for me to write an order for the bonds, to get in the vault, and after I called Mr. Partee and Mr. Barbee, while I was waiting for them to come, I wrote the order to Mr. Read to let me in the vault for them. I left it on the table until they came."

Thus it will be seen that, accepting the testimony of this witness as reliable, at any rate, we have a clearly expressed intention on the part of the donor, who was practically in the face of death, to give these choses in action to the complainant. This intention, so far as the certificate of deposit is concerned, was consummated, it would seem, according to this witness, who

states explicitly that he (the deceased) "gave it to my mother."

It is objected that this statement is a mere conclusion, and, over the objection of the defendants, should not have been considered by the chancellor. We do not agree to this. We think the statement simply characterizes the act by which the intention of the donor was completed, and is as if the witness had said he "handed it to her." That it did come to her possession, after being indorsed by Capt. Marley and his manual control over it relinquished, is clear from the fact that the complainant then put her name on the back of the certificate. If the witness is right as to the expressed intention of Capt. Marley, when the same was taken from the safe and put in his hands, that he wanted to give it to the complainant, then, when the act of indorsement by him was followed by its possession by Mrs. Scott, as indicated by her indorsement, nothing else appearing, we think that the presumption would be that the possession was with the consent of the donor, and for the purpose of accepting the gift.

Leaving the testimony of Joe M. Scott for a moment at this point, we will now go to that of Messrs. Partee and Barbee, who were called, at the instance of Marley, from their places of business in Ripley, the one to take his acknowledgment as notary, if necessary, and both as witnesses to his execution of these papers. According to these parties, immediately after getting the message communicated through Joe Scott, they went to the

Scott v. Bank.

home of the complainant, where they met Mr. Scott. According to these witnesses (for they agree in this), on meeting them, Mr. Scott said: "Captain had attempted to transfer to his mother a certificate of deposit and given an order for his bonds and wanted them as witnesses." Mr. Scott's statement of what he said at the time is slightly, but immaterially, different. This testimony of all these witnesses was objected to for incompetency; but the objection was overruled. We are by no means satisfied that on this record it was incompetent. It is clearly apparent that the defendant, at any rate, reflected on the credit of Scott, and it may very well be insisted that this statement, made before his mother, and consistent with what he testified to, was properly admitted as tending to support his credibility.

But, if it be conceded that it was incompetent, as originally given, we think, so far as Mr. Barbee, at least, is concerned, the appellee is now estopped to make the question. While a cross-examination, with regard to incompetent testimony admitted over the objection of counsel, may be made, without waiving the objection, we do not think the cross-examiner can have a witness embody such testimony in his cross-examination, and yet rely upon his original objection. This occurs in the course of the cross-examination of Mr. Barbee:

"Q. You say Mr. Joe Scott met you at the gate?

"A. Yes, sir. . . .

"Q.   I wish you would now state just what Mr. Scott said to you on that occasion?   .   .   .

"A.   He said that Capt. Marley had attempted to transfer a certificate of deposit to Mrs. Scott, and that he had made rather a poor signature, and that he thought best to have some witnesses to the signature."

This is found repeated in a written memorandum, made by Mr. Barbee two or three days after the transaction, when the matter was fresh in his mind, which is made an exhibit to his deposition.   No effort was made to expunge this from the record, or the statement on cross-examination, so, if the testimony which was challenged was regarded as incompetent, we have the same established in these two forms left uninterfered with.

Mr. Partee says, in regard to the then meeting and what transpired:   "We went in, and Capt. Marley spoke to us, recognized us both, spoke to us and shook hands, and Mr. Scott just remarked to him that we came to witness his signature, and Mr. Scott handed him the certificate of deposit, that Capt. Marley had already signed, and Capt. Marley said he wanted us to witness his signature on it, that he had written it so badly he was afraid it would not go, or something to that effect; and I am a notary public, and he requested that I put a notary public certificate on it, and asked me to take a formal acknowledgement, and state in that acknowledgment that he was personally known to me. I told him: 'Uncle Joe, I don't think it necessary to

Scott v. Bank.

put a notary's certificate on it. Two witnesses are as binding as a notary.' He says: 'Well, I prefer it that way.' So then Mr. Barbee witnessed it, and I witnessed it, and then they handed us the order to Mr. Read for the bonds, and I handed him a pen, and told him to sign it; but the position he was then in, in the bed, lying flat on his back, he could not handle a pen. In fact, the ink would not flow. I had an indelible pencil, and I handed him that, and he signed his name, and we witnessed it." The witness further stated that, after some brief conversation with Capt. Marley, he left the room, and, when he did so, he thought Mrs. Scott had the certificate of deposit; that she was at his bedside when he witnessed; but "possibly he (Capt. Marley) held it himself."

So far as we can discern, the testimony of Mr. Barbee corresponds with that of Mr. Partee as to this incident, and we not reason, therefore, to embody it here.

Soon afterwards these parties left; Mr. Joe Scott accompanying them to the gate. Parting company with them there, Mr. Scott testifies as to what afterwards transpired as follows:

"I then went down to the pond and lot and was gone about thirty minutes or an hour, and when I got back my brother came out on the porch and called to me and said Uncle Joe wanted to see me, and said he wanted to know when I was going to Memphis, and I told him I thought I would go the next morning, and he said, 'You

Vol. 123—19

had better go this evening and take a strong sack with you and don't lose anything and get everything.' "

In this he is corroborated by Lee Scott and his mother. He is then asked, "Did he (Capt. Marley) make any further statement as to what to do with what you brought back?" To which he replied, "He told me to give them to my mother." He then took the certificate and the order, but is unable to say whether his mother had them or he got them from the table, where, evidently, they had been witnessed by Partee and Barbee and possibly had, by them, been laid there. Acting upon the suggestion of Capt. Marley, the witness went to Memphis on the night train, presented his orders on the next morning, when, after some delay, both were honored—but only after the death of Capt. Marley.

As to his mental condition at the time Messrs. Partee and Barbee were there, they were both examined. Mr. Partee testified as to Capt. Marley's mental condition, at the time of this transaction, as follows:

"I think he knew what he was doing from the fact that he emphasized and seem to be very positive that he wanted the thing done right, so there would be no hitch at the other end, and by him requesting me as a notary public to put my certificate to it, and all, I think he knew what he was doing."

This witness further states that he had a little further conversation with Capt. Marley, about the anticipated return of his (witness') father home, and the witness said:

Scott v. Bank.

"I told him I was going to bring my father out there. He asked how he was, and I told him, and he said he would come to see him just as soon as he could, and he thought he could come to see my father earlier than my father could come to see him."

Mr. Barbee states that, when there on the occasion with Mr. Partee, he noticed that Capt. Marley was breathing hard, and, save when talking, would close his eyes, as if dozing; but that he had not lost his mentality is apparent. Mr. Barbee had, some time during the preceding January, spoken to Capt. Marley about obtaining a loan of money, somewhere in the early part of the succeeding May. About a week before Capt. Marley's death, Mr. Barbee drove out to Mrs. Scott's to see him about this matter, and in a few days Capt. Marley sent him word, through Mr. Joe Scott, that "he could probably arrange the matter for" him. However, on the day the witness was there to attest the papers in question, and after this was done, Capt. Marley asked him to come to his bedside, and, when he did so, this occurred:

"Well, Capt. Marley said to me that he had promised to let me have some money, and that—but he didn't know what sort of shape things were in, and that if it inconvenience me too much that he would rather hold up on that thing a little while. He also said: 'The doctor says I am getting better, but I don't think I am. I don't know about that; I don't know what is going to happen.'"

This business conversation ended with the suggestion from Capt. Marley that his "sister, Mrs. Scott, will probably arrange that matter."

His various directions to Joe Scott, already detailed, and his conversations with Messrs. Partee and Barbee, tend strongly to establish, though worn with age and disease, and but a few hours removed from a comatose state followed later by death, that, at the time the certificate was indorsed and the order was signed and both were witnessed, Capt. Marley was in full command of his mental faculties, and knew exactly what he was doing.

In arriving at this conclusion, that Capt. Marley was of "sound and disposing memory" when he made the alleged gifts, we are not unmindful of the testimony of Foss Marley, who testifies to apparent flightiness, or illusions, discovered by him in Capt. Marley in the morning of the 11th of May. According to this witness, when he went to his bedside, he was aroused by his sister, the complainant, from a profound sleep, and spoke to witness about a "wreck" and a "camp or logging outfit." It is not remarkable that he should have waked with the impression that he had been in a "wreck," as only just before his bed gave way, and only by speedy action of those in the room was he saved from precipitation to the floor. Nor is it remarkable that in his sleep his mind should have reverted to logging camps, when it can well be inferred, from his sales of timber and timber lands, that he was more or less familiar with

those matters.   But, as against this, we have the testimony of Mrs. Scott, Joe Scott, Dr. Lackey, Messrs. Partee and Barbee, and others, as to his sanity at and about the time the transactions involved took place.

It is true, Mr. Barbee says that while he was at the house, to witness the papers, Capt. Marley, at intervals, closed his eyes, as if "dozing" or sleeping, but Judge Kirkpatrick, whose client he had been and to whose office he often resorted, testified that this was a habit of Capt. Marley's; that especially in dictating he generally closed his eyes, as if absorbed with the matter in hand, and opening them from time to time, as the work progressed.

Nor do we find any evidence of fraud or undue influence practiced on Capt. Marley.   We think it impossible to read the testimony of Mrs. Scott without being impressed with her intelligence and perfect candor.   No effort at exaggeration is discoverable.   We find no indication of a purpose to make a case where one did not exist, or to emphasize facts with the design of aiding her contention.   If dishonest, there is much about which she might have been certain, which would have tended to greatly strengthen her case, if admissible at all under the statute.   Considering the amount at stake, her conservatism is remarkable.   That she thoroughly believed that her brother intended to give, and in fact did give, her these choses in action, and, in accepting them at his hands, his more remote relations should not complain, we are entirely satisfied.

We are equally so, that the circumstances of the transaction, if they are as testified to by Mr. Joe M. Scott, are far within the authorities. While it is unfortunate that the claim of complainant rests largely upon the testimony of a member of her own family, yet this is not by any means unusual. Gifts *causa mortis* are frequently made when the donor is in *extremis*, or, at least, in the face of imminent peril. In this condition, when stretched on the bed of pain, it is natural for only those of his own household to be about him. The chamber of death is not one that the curious stranger, or the indifferent friend, would be likely to invade. Thus it is such a gift frequently rests upon the testimony of some one privileged by relationship to be near the donor.

In considering the testimony of Mr. Scott, we give ful weight to the fact that he is the son of the aged donee, and naturally might look forward to no remote future when he would share in the estate of which death found his mother possessed. Nor do we overlook that in his answer he denied that there had been such a delivery as to make the gifts in question valid in law. This, however, was but the assertion of a legal conclusion, and not of a fact. But the circumstances surrounding these gifts, to which he testifies distinctly, are true, or else he is guilty of deliberate prejury. We find nothing in the record to authorize such a conclusion. No effort is made to impeach him, by the testimony of those who have known him, and we discover no in-

trinsic evidence to discredit him; and this must be done in order, to hold under the law that these were not valid gifts *causa mortis*.   He had been closely associated with his uncle; had aided him as bookkeeper and otherwise in his business; had earlier, during his last illness, gone at his request to Memphis and had gotten out of his box in the safety vault, in the defendant bank, and had brought to him bonds of the value of $37,000, which his uncle gave to his mother.      That Capt. Marley had confidence in his intelligence and honesty is clearly shown in the record.   Of all persons, then, it seems to us most reasonable that he should have been the one selected to perform the offices required in this matter.

The case, then, involves itself into this:   An old man who has accumulated an estate of several hundred thousand dollars, in peril of death, without wife or children, for years the inmate of the home of his sister, a few years his senior, who has ministered to him in sickness and been his companion in health, in furtherance of a plan, which we are satisfied he had long entertained, of leaving a large portion of his portable wealth to her, and which he had before, in part, executed, sought to carry out that plan.   In undertaking to do this, we have no doubt, he indorsed the certificate of deposit and signed the order for the bonds.   Mrs. Scott, understanding this to be the purpose of her brother, accepted these gifts.   She states positively this to be so, as to the certificate.   This, however, is immaterial.   In such a case, the law presumes an acceptance.      *Barnard* v.

*Thurson,* 86 Minn., 343, 90 N. W., 574; *Ammon* v. *Martin,* 59 Ark., 191, 26 S. W., 826; *De Levillain* v. *Evans,* 39 Cal., 120. These papers executed, as has been heretofore stated, were then delivered to the son of complainant, that he lose no time in getting from the bank the money and bonds they called for, and return safely with these things for his mother. In the absence of facts showing otherwise, the presumption of law would be that the delivery to him was as trustee for his mother. *Varley* v. *Sims,* 100 Minn., 331, 111 N. W., 269, 8 L. R. A., (N. S.), 828, 117 Am. St. Rep., 694; *Devol* v. *Dye,* 123 Ind., 321, 24 N. E., 246, 7 L. R. A., 439; *Johnson* v. *Colley,* 101 Va., 414, 44 S. E., 721, 99 Am. St. Rep., 884. This presumption simply supplements the positive swearing of the witness Scott.

It is insisted that the fact that Mrs. Scott had a will prepared for her brother to execute, the evening preceding his death, in which his various relatives were provided for, while the residuum of the estate was given to her, negatives her present contention. Her explanation entirely relieves her, and makes this effort of hers entirely innocent. But even if she did, mistaken as to her right under the previous gifts, this could not affect her legal relation to them.

If in sound mind at that time, as we are satisfied he was, the question necessarily arises: What could have been his purpose in sending for the money on deposit in the bank and the bonds, unless it be he wished to place all in the manual possession of this old and fa-

Scott v. Bank.

vorite sister? We can conceive of no other reason, and none is suggested by counsel.

After a careful examination of the record, we have reached the conclusion, which we think sustained by clear and cogent proof, that the deceased, in sound mind, uninfluenced otherwise than by strong affection for his sister, intended to and did give her these choses in action, and, to obtain the proceeds of the same for her, directed Joe M. Scott to take charge of them to that end, as her agent or trustee. The gifts thus made were unqualified in terms. The donor neither reserved to himself interest in or possession of these properties, as was the case in *Young* v. *Young,* 80 N. Y., 422, 36 Am. Rep., 634.

The decree of the chancellor is reversed, and decree here for complainant.