McADOO v. DICKSON et al.—126 S. W. (2d) 393.

Western Section. May 10, 1938.

Petition for Certiorari Denied by Supreme Court, Feb. 4, 1939.

J. H. Norville, of Memphis, and J. W. Wilson, of Nashville, for complainant.

Gilliland & Gilliland, of Memphis, for defendants.

SENTER, J. This litigation grew out of the right of possession and ownership of the contents of a lock box rented by Dr. E. C. Freas, now deceased. The contents of the said lock box at the Union Planters National Bank & Trust Company of Memphis, Tennessee, consisted of certain securities and assets valued at approximately $10,000 at the time of the death of Dr. Freas.

In 1933 Dr. Freas executed a last will and testament naming the complainant, his half brother, the executor, which will was duly probated in the Probate Court of Shelby County, Tennessee. By the terms and provisions of the will Dr. Freas gave his entire estate equally to his half brother, who then resided in Nashville, Tennessee, and to his half sister, who then resided in the State of Florida. Prior to the execution of the will which was probated, Dr. Freas had exe-

cuted a will by which he devised and bequeathed his entire estate to the complainant, but subsequently revoked that will and executed the will of 1933, which will was probated and which is made the basis of the contention of the complainant as executor of said estate that the contents of the lock box constituted a part of the estate so willed and bequeathed, and that as executor of the said estate he was entitled to the possession of the contents of the said lock box.

The facts in the second trial are practically the same as in the first trial, there being very little difference in the evidence offered by the respective parties, except that the defendant Mrs. Dickson offered two additional witnesses who did not testify at the former trial, to further support her contention that the contents of the lock box had been made the subject of a completed gift causa mortis to her.

At the former trial the only issue submitted to the jury by the chancellor was as follows, "Did Dr. E. C. Freas before his death make a completed gift of the contents of this lock box at the Union Planters National Bank & Trust Company of Memphis, Tennessee, to the defendant, Mrs. Jessie Dickson" and declined to submit any further issues of fact to the jury. After the court had charged the jury, the jury at the first trial returned its verdict and answered the issue submitted in the negative. At the first trial and at the conclusion of all the evidence the defendant Mrs. Jessie Dickson moved the court to direct a verdict and to enter a decree in her favor. That motion was overruled, as was also a motion for a new trial made by Mrs. Dickson, and a decree on the jury verdict entered in favor of the complainant, awarding to complainant the possession of the contents of the lock box involved in this litigation.

From this decree the defendant Mrs. Jessie Dickson prayed and was granted an appeal to this court. There were numerous assignments of error by Mrs. Dickson, and upon her appeal to this court, this court held that the Chancellor erred in failing to give to the jury a proper definition of a gift causa mortis, and that the issue submitted and also the charge of the Chancellor to the jury thereon defined a gift inter vivos, and not a gift causa mortis. For this error, this court in the former opinion reversed the decree of the Chancellor and remanded the cause for a new trial. Both parties filed petitions for the writ of certiorari in the Supreme Court. The petitions of both of the respective parties were denied by the Supreme Court and the cause was retried to a jury under the remand order of this court. Issues of fact were submitted to the jury by the Chancellor, and the jury found the issues in favor of the defendant Mrs. Dickson, and by their verdict found that there had been a completed gift causa mortis to Mrs. Dickson of the contents of the lock box involved in this litigation. There was a motion for a new trial by the complainant, which motion was overruled by the Chancellor, and a decree rendered in favor of the defendant, awarding to

her the contents of the lock box under the gift causa mortis made to her by Dr. Freas.

From this decree of the Chancellor the complainant has appealed to this court and has assigned errors.

On the former appeal this court filed an opinion which fully set forth the facts as shown by the record, with a full discussion of the evidence, and held that the evidence presented questions of fact properly to be submitted to the jury under proper instructions from the court.

Under the numerous assignments of errors on the present appeal the contention is made that under the evidence the proof was insufficient to sustain a gift causa mortis to Mrs. Dickson; that there was no material evidence to support the verdict of the jury; that under the evidence introduced by the respective parties the Chancellor should have held that as a matter of law the evidence was insufficient to sustain a completed gift causa mortis of the contents of the lock box. Several of the assignments of error are directed to certain portions of the Chancellor's charge to the jury on the issues submitted. Several of the assignments of error challenge the action of the Chancellor in refusing to give in charge to the jury certain special requests set out in the respective assignments of error. Other assignments present the question that the Chancellor erred in admitting certain testimony introduced by the defendant over the objections of the complainant, and to which exceptions were properly made.

It appears that Dr. Freas, by his own efforts and industry, succeeded in getting a medical education at Vanderbilt University, that after practicing his profession for a short while in his home county in Middle Tennessee he moved to the city of Memphis, where he engaged in the practice of his profession. He was twice married but no children were born to either marriage. He acquired a home in the city of Memphis, where he lived until after the death of his second wife. For a period of twenty-five years he had completely lost sight and connection with the complainant, his half brother, and did not know for many years where his half brother resided. He seemed to have had some knowledge that his half sister was living in Florida, but he had had no communication with his half brother or half sister in about twenty-five years or more. After the death of his second wife, and after he had retired from the practice of his profession, he sought to have certain friends occupy his residence in Memphis, who would give him a home in the residence, but after some experiments along this line, he became dissatisfied and sold his home and went to live in a hotel in Memphis.

It appears that he was lonely and desired companionship. He was old and had been enfeebled by age. Upon the suggestion of friends he applied for and was admitted to a semi-charitable institution in

the city of Memphis, the "Sunshine Home," the inmates of which paid a nominal sum, about $10 per month, for their room and board. This institution was supported, maintained and managed by a group of ladies in the city of Memphis. Mrs. Jessie Dickson, the defendant herein, was the matron of the Sunshine Home. The record discloses that she was a lady about fifty-five years of age and was very capable and highly efficient as the matron of this institution. She was a lady of unusual disposition and took great interest in the inmates of the institution. She was always kind and considerate of all the inmates and they in turn were devoted to her because of her thoughtfulness and consideration.

It appears that Dr. Freas enjoyed his residence in this institution and became very fond of Mrs. Dickson, as did all of the inmates. She was especially kind and considerate of Dr. Freas. She evidently did not know that he possessed any property or means. While an inmate of the home Dr. Freas suffered a slight stroke of paralysis and it was thought that he could not longer remain an inmate of this institution, since it was contrary to the policy of the institution to minister to permanent invalids. In this situation he became very much disturbed and fearful that he would have to leave the institution.

It also appears that he had certain business interests at his former home in Middle Tennessee, which required occasional visits. While on one of these trips he learned that his half brother, who he had not seen or heard from in about twenty-five years, was living in Nashville. He called on this half brother, and in the language of the half brother, they "renewed their acquaintance." After that when he would have occasion to go to Middle Tennessee to give some personal attention to his business, when passing through Nashville he visited with his half brother, the complainant. It also appears without conflict in the evidence that he had furnished financial assistance to a nephew and aided him in securing a medical education. This nephew became an interne in the Methodist hospital in Memphis. He had also suffered some imposition by another nephew who lived in a Middle Tennessee town. This nephew had perpetrated certain frauds on him and had forged his name to certain checks which Dr. Freas paid.

On one occasion he was confined to the Methodist hospital as a patient. He went to the Methodist hospital especially because he knew that the nephew he had aided in securing his medical education and given financial assistance was an interne there, and he expected to receive some special consideration at the Methodist hospital from this nephew. In this he suffered great disappointment. The nephew, an interne, extended to him no courtesies or consideration, but assumed a very indifferent attitude and the record reflects that the nephew regarded his uncle, Dr. Freas, as a nuisance and was no

doubt ashamed of him. This very much embittered Dr. Freas against this nephew as he had already become greatly embittered toward the nephew who had defrauded him.

After visiting with his half brother, in 1932, he executed a will by which he bequeathed all his property to his half brother, the complainant. Later he got in communication with his half sister in Florida and revoked the former will of 1932 and made a new will by which he divided his property equally between his half brother at Nashville, the complainant in this cause, and his half sister in Florida. After he suffered the slight stroke of paralysis and becoming fearful that he would again be without a satisfactory and comfortable place to live, he wrote his half brother in Nashville and also his half sister in Florida, inviting them to visit him in Memphis to discuss with him the matter of his living with one or the other of them, and suggesting that he would will the property to them. He proposed in the letter to defray all the expenses of the visit. In response his half brother first visited with him in Memphis, and he took him to the bank and showed to his half brother the will which he had in the lock box and again expressed his intention of leaving his property to them, but desired a home either with his half brother or his half sister. His half brother returned to Nashville and then wrote him that for reasons set forth that it would not be convenient to take him in his home; that it would necessitate building additional room.

Soon after the visit of his half brother, his half sister who resided in Florida accepted his invitation to visit him in Memphis and he then made to her the same proposition, after advising her of the contents of his will and expressed the desire to live with her in Florida. She explained to him that she was not so situated or circumstanced as to have him make his home with her in Florida.

After these efforts to procure a home with his half brother or half sister had failed, Mrs. Dickson took his case up with the ladies composing the board of control or directors of the Sunshine Home and explained to them that she did not think he was seriously ill or helpless and that she would be glad to give to him special attention if they would agree that he remain at the home, and as a result of her solicitude for him he was permitted to remain an inmate of the institution. On many occasions and to a number of persons he expressed his appreciation of the kindness which Mrs. Dickson had shown him.

Shortly before his death he fell and received serious personal injuries. His hip was broken and he received other injuries. He was then removed to the Baptist Memorial hospital in Memphis. While there Mrs. Dickson visited him several times and showed him special attention and interest.

This brings us to the material facts as disclosed by the record with

respect to the property involved in this litigation, the contents of the lock box. However, before proceeding with the discussion and consideration of the incidents directly connected with the contents of the lock box, we deem it important to refer to the evidence with respect to the attitude of Dr. Freas toward his relatives, including his half brother and half sister. Several witnesses testified in substance that Dr. Freas had become embittered toward his relatives and that he desired to provide well for Mrs. Dickson because of the kindness and consideration shown him by her while he was an inmate of the Sunshine Home. To several of these witnesses he had expressed the intention of providing well for her and to some of them he had expressed the intention of giving his property to Mrs. Dickson at his death.

There can be no doubt but that he felt a deep gratitude to Mrs. Dickson for the interest and solicitude she had shown him and in his behalf. All the evidence in the record reflects that on numerous occasions he had expressed his fondness for and appreciation of Mrs. Dickson. In conversation with the other inmates of the Sunshine Home he had also referred to the disappointment that he had suffered at the hands of his relatives. To one of the inmates with whom he had become especially intimate, he frequently spoke of his disappointment and his feeling against all his relatives, including the complainant, his half brother, and his half sister. He frequently stated that they cared nothing for him or his welfare and that all they wanted was his property and he intended that they not receive any of it. To this intimate friend he expressed his intention to disappoint them at his death; that he intended to give his property to Mrs. Dickson and that when his relatives opened the lock box they would find it empty. This witness testified that Dr. Freas used very strong and sometimes profane language in referring to these relatives. According to this witness Dr. Freas seemed to feel that it would be a joke on the relatives when they opened the lock box and found it empty. On one or more occasions when discussing the matter with this friend, an inmate of the institution, and after expressing his intention of providing well for Mrs. Dickson and after referring to the fact that he had made a will by which he had given his property to his half brother and his half sister, this friend inquired of him if he should not make a new will if that was his intention. According to the testimony of this witness, Dr. Freas' reply to this inquiry was that he did not want to make a new will because it would probably result in litigation, but that he intended to give what he had to Mrs. Dickson before his death and that by giving her the property and delivering it to her there would be no will to litigate over.

On the day that Dr. Freas died, and while he was a patient in the Baptist Memorial hospital in Memphis, and seemed to realize that

he could not hope to recover from his injuries and that death was imminent, he sent for his friend and business advisor, Mr. Revill, an officer of the Union Planters National Bank & Trust Company, who had assisted him in drawing the first will of 1932 in which he had given his property to his half brother. When Mr. Revill arrived at the hospital he found Dr. Freas encased in a plaster cast and in a very uncomfortable position. He was lying on his face. When Mr. Revill received the message to visit Dr. Freas at the hospital and that it was an urgent message, his first thought was that Dr. Freas desired to make some change or changes in his will which was in the custody of Mr. Revill. We refer now to the will of 1932, and not to the last will in which his half brother and half sister shared equally in his estate. Mr. Revill did not know of the execution of this last will, but anticipating that Dr. Freas desired to make some change in his will, he took the will of 1932 with him when he went to the hospital in response to the message from Dr. Freas. When he reached the hospital and found Dr. Freas in the uncomfortable position to which we have referred, he found that Dr. Freas could not carry on a conversation, but could answer the questions of Mr. Revill. Mr. Revill produced the 1932 will and told him that that was his will. By signs and words Dr. Freas communicated to Mr. Revill as best he could that that was not his last will. Mr. Revill had to do practically all the talking and Dr. Freas would answer his questions generally by the words "yes" and "no" or in very brief sentences. At that time he appeared to be in possession of his mental faculties but was suffering and uncomfortable.

We quote the following portion of the testimony of Mr. Revill with respect to what took place after he reached the hospital:

"Q. Well, what was Dr. Freas condition at that time,—first, his physical condition, and, second, his mental condition? A. Well, he was in a cast, as I recall, perfectly conscious. Of course, he knew me when I went in, knew my voice; he was on his back and having difficulty in breathing, and there was a cone of some sort through which he was breathing or inhaling and exhaling.

"Q. Just what was that cone—hot water or vapor? A. I don't know just what it was; it may have been a rolled newspaper; it may have been a pasteboard tube; it was a cone that was used, held over his face that he could breath in and out of it.

"Q. Now, just tell a little bit about the cast that you mentioned— he was in a plaster cast, I believe you said? A. Yes, that was my impression—I don't know much about it, except that he couldn't move about. One leg wasn't in the cast, I remember, because the girl was rubbing it with alcohol from his knee down, perhaps.

"Q. Well, now, after you got the summons, the second summons that day to go and see Dr. Freas, through Mr. Barbour, what, if

anything, did you take with you from the bank? A. Some years before, I had helped Dr. Freas prepare his will, and I took a copy of that will with me.

"Q. Well, now, you, of course, went out there for the purpose of finding out what Dr. Freas wanted? A. That is right.

"Q. Now, how long did you stay with him, Mr. Revill? A. Mr. Gilliland, I don't know; perhaps three-quarters of an hour; maybe not that long; maybe a little longer.

"Q. Now, just without trying to state at this time exactly what was said, explain to the jury the kind of conversation that you were having with Dr. Freas. A. Dr. Freas had a great deal of difficulty in talking; it seemed to be his breathing more than anything else, and he could only say a few words at a time, so our conversation was made up largely of questions which I would ask and his one or two word replies.

"Q. Well, now, could you say what proportion of the talking you did? A. I did most of it.

.  .  .  .  .  .  .

"Q. Well, now, was Mrs. Dickson present during practically all the time you were there? A. She left the room for a time, but she was there when I went in and before I left, she came back.

"Q. I say, was she there during a large part of the time you were talking to him? A. Yes.

"Q. Well, now, I believe I asked you, of course, your purpose in going out there was to find out what Dr. Freas wanted? A. That is correct.

"Q. Now, after you had been there some little time, which you estimated, you went down to Mr. Sheats' office? A. Yes.

"Q. What did you go for? A. I went down to ask Mr. Sheats to come up and witness an authorization to enter Dr. Freas' lock box.

"Q. Well, did he come? A. He did.

"Q. Now, did you prepare the instrument that you said Mr. Sheats was to witness? A. I dictated it to Mr. Sheats' stenographer.

"Q. And asked him to come back up there with you to be a witness? A. That is correct.

"Q. Will you please inspect the photostatic copy, which has been agreed is a true copy of the original—is that the instrument that you had signed? A. It is.

"Q. Would you please just read that? A. (Reading) To the Union Planters National Bank & Trust Company, Memphis, Tennessee. In re Box 2537. July 25, 1935. I hereby designate and appoint Mrs. Jessie Dickson as my deputy and agent to have access to the safe covered by this contract, to take and remove from or add to the contents thereof, and have full and absolute control over the same, hereby waiving any liability of the lessor arising out of the exercise by said deputy of any of the powers herein contained.

Signed by E. C. Freas as lessee and Mrs. Jessie Dickson as deputy and George Sheats as witness.

"Q. State whether or not that was signed in your presence. A. It was.

"Q. Who filled in the name of Mrs. Dickson? A. I did.

"Q. At whose direction? A. Dr. Freas'.

"Q. Now I believe you stated before adjournment that you had sold Dr. Freas practically everything that he had in his lock box? A. Correct.

"Q. Well, of course, Dr. Freas knew that—I say, Dr. Freas recognized that? A. Yes.

"Q. Now, Mr. Revill, in view of the character of the conversation that you had with Dr. Freas on this occasion, your knowledge of him and his knowledge of you, what was said by you and his responses, did you find out what Dr. Freas' wishes were, and why he had called you out there?

"Mr. Norville: I object to that, may it please the Court—it doesn't call for anything but a conclusion, and all of that is for the jury to determine and not the witness.

"The Court: The objection is overruled.

"Mr. Norville: We except.

"Q. Did you get clearly the objection was overruled—you got clearly the question? A. Yes, sir.

"Q. Now, please state to the jury what you found out from the conversation, and what was said and done, and the general situation, what Dr. Freas had called you out there for, and what he wanted done? A. He wanted to get,—in my opinion, to get the securities out of his box,—he wanted to get the securities out of the box to give to Mrs. Dickson was the only impression I received.

"Q. Can you state whether or not there was any doubt at all as to that being what he wanted?

"Mr. Norville: We renew our objection.

"The Court: The objection is overruled.

"Mr. Norville: An exception.

"A. No, if I had not have had such a clear idea, my conduct from that time forward, I believe, would have been different.

"Q. Now, did you find out whether or not Dr. Freas wished to make a new will? A. I gathered that he did not want to make a new will.

"Q. Did you find out what—whether he wanted the contents of his box to go under his will? A. I gathered that he did not want them to go in accordance with his will. (Excepted to and exceptions overruled.)

"Q. You knew Dr. Freas had some stock certificates in his box, you stated? A. I did.

"Q. I will ask you to state if you were under the impression or

knew that in the ordinary course of legal transactions, before a stock certificate can be transferred, it has to be signed and witnessed by the person named in the certificate? A. That is correct.

"Q. Well, now, you have stated that you found out what Dr. Freas wanted. Well, now, Mrs. Dickson was present? A. She was.

"Q. Well, I want to ask you about that. After you found out what the doctor's wishes were, what did you then do? A. Well, I then told him that we would prepare an authorization to get his securities, and I got George Sheats to come to the room and read it to Dr. Freas, who understood it thoroughly, filled it in, and he signed it, Mrs. Dickson signed it and George Sheats signed it.

"Q. Then what did you do? A. Then it was necessary to get the key to the Dr.'s box, which Mrs. Dickson had at the Sunshine Home. In my car, Mrs. Dickson and I went by the Sunshine Home and got the key and went to the Bank.

"Q. When you got to the bank, what did you do? A. On the way down from the hospital, I thought carefully of possible complications that might arise.

"Q. For instance, what? A. Well, here was an old man about to dispose of all his securities before his death. I knew that he had had a will; I had helped him prepare it, and I could see legal entanglements in the future. To confirm my own idea, when we got there, I excused myself from Mrs. Dickson and went over and talked to Mr. Alexander, the President of the bank, and told him what was taking place, and asked him if he didn't think it would be well for us to get a lawyer to go with me from that time forward, and he agreed, and I called you.

"Q. Did the lawyer come? A. Yes, you got there promptly.

"Q. Did you explain what he was called there for—did you first explain the circumstances and then why he was called? A. Yes, I did; as I recall, I told you just what we were up against; that the water was getting a little too deep for me, and I wanted a lawyer along with me, telling you, as I recall, I didn't know who you were representing, or what, but I wanted you to see that the Doctor did properly what he wanted to do, and on that basis, you agreed to go along.

"Q. I will ask you if you explained what the Doctor wanted to do? A. I am confident I told you at the time. (Question objected to and objection overruled.)

"Q. All right. A. I am confident I told you that the doctor wanted to dispose of his property.

"Q. To whom? A. To Mrs. Dickson.

"Q. Well, upon what conditions did the lawyer agree to accompany you? A. I think you said that you would go along with me and wait outside in the hall where, if I needed you, you would be available. I considered it you were doing it as a favor to me.

"Q. Now, after you got that explanation over to the lawyer, what did you then do? A. The lawyer and Mrs. Dickson and I then went to the lock box where she presented her authorization and the key. We took the box out into a coupon room, and you and I made a detailed inventory of everything in the box.

"Q. Just at this juncture, Mr. Revill, what was the purpose of that inventory being made, and whose idea was it—in other words, was that Mrs. Dickson's idea? A. I don't remember whether it was your idea or mine.

"Q. But it wasn't Mrs. Dickson's? A. I am pretty sure of that.

"Q. State whether or not you recall the lawyer on that occasion saying that he wanted to take care that nobody accused him of sticking a bond in his pocket? A. Yes, I believe I do, now that you mention it; it might have been wise precaution.

"Q. From that refreshing of your mind, can you state whether or not it was the lawyer's suggestion about making a detailed inventory? A. Yes, as I remember it.

"Q. Can you state whether or not that was a suggestion made in view of the statement you had made to the lawyer there would possibly by some litigation in the future? A. That is correct.

"Q. Well, the inventory was made? A. It was.

"Q. Then what did you and this lawyer and Mrs. Dickson do? A. Returned to the hospital.

"Q. Well, what did you find when you got there? A. As we got off the elevator on the doctor's floor the interne met us at the door, stating that the doctor had just passed away.

"Q. Well, then, to the best of your recollection, relate what you did, and Mrs. Dickson, and the lawyer did thereafter. A. I believe the interne told us that it would be necessary that the undertaker be notified at once. I recalled that in going through the Doctor's effects, he had a National Burial Insurance policy, and as I recall that policy was taken from the little satchel in which we had the Doctor's securities, and either Mrs. Dickson or I phoned the National Burial Home and advised them of it.

"Q. Well, I overlooked asking this question, Mr. Revill, When you and the lawyer and Mrs. Dickson went to the Safety Box Department Mrs. Dickson presented the authorization? A. Correct.

"Q. Do you remember whether it was to Mr. Gholson, or to whom? A. I think it was Mr. Gholson, but it might have been Mr. Charles. I think it was Gholson.

"Q. Well, state to whom the attendant at the bank delivered the contents of Dr. Freas' box? A. Mrs. Dickson.

"Q. After it was opened with the guard key and the key that Mrs. Dickson had,—the key to the box? A. To Mrs. Dickson.

"Q. Well, please state what purpose you had in mind in taking

the contents of Dr. Freas' lock box back to the Hospital to him? A. So that the doctor could dispose of them as he saw fit.

"Q. Well, with reference to the stock certificates, what did you have in mind with reference to them? A. Well, I though that in order to transfer these stock certificates, which I felt reasonably sure were unendorsed, they would have to be assigned to whoever the Doctor chose to give them.

"Q. You had never heard of a gift causa mortis at that time? A. No, sir, I had not.

. . . . . . .

"Q. Now, Mr. Revill, you stated that you found out from Dr. Freas that his wishes were to give to Mrs. Dickson the contents of his lock box? A. That was the definite impression that I gathered.

"Mr. Norviue: We note an objection.

"The Court: The objection is overruled.

"Mr. Norville: We except.

. . . . . . .

"Q. Now, Mr. Revill, one further question: I want to ask you about the power of attorney. So far as the power of attorney itself is concerned, what purpose did you have in mind to accomplish when you prepared that in George Sheat's office at the hospital. (Question objected to and objection overruled.)

"Q. What was the purpose of the power of attorney you had Dr. Freas sign out there that you wrote? A. To enable Mrs. Dickson to get the doctor's securities from the box.

"Q. What purpose other than that did you have in mind to cover in drawing the power of attorney? (Question objected to and objection overruled.) A. Well, the doctor meant to dispose of his property. In order to do it, somebody would have to get it out of his box; he couldn't get it.

"Q. He was sick? A. That is right.

"Q. Now, my question is, so far as the power of attorney is concerned, whether it was executed for any purpose other than to permit Mrs. Dickson to get into the box? A. Following that thought through, it was to enable the doctor to give his property to Mrs. Dickson.

"The Court: In other words, the court understands Mr. Gilliland is trying to bring out, and what the court thinks is very material in this lawsuit, what was in your mind when you selected the particular language that was used in that power of attorney—whose language was it, and why—that particular language rather than some other language?

"A. That is the language that—I dictated that from a printed form which we use on all our authorizations for entrance to a lock box, which our attorneys prepared many years ago.

"Q. Now, that word agent there, was that a general agency, or

was that exclusively limited to gaining admission to the lock box, that is, the power of attorney itself—I am not talking about what other purpose Dr. Freas had in mind—do you understand my question? A. No, I don't know what you have in mind. (Question objected to and objection overruled.)

"Q. You stated you dictated that power of attorney? A. From a copy of an authorization, printed, which we have for the safety deposit boxes for use in similar cases which undertakes to convey complete authority over that box to a designated person.

"Q. My question is now, when that sort of an instrument or power of attorney is signed, does that have anything to do with what the deputy coming into the bank is to do with the contents of the box? A. No, that is no concern of the bank.

"Q. Now, was that what you were intending to draw in that instrument? A. Yes.

"Q. Do you know whether that was what Dr. Freas was intending? A. Yes. (Question and answer objected and objection overruled.)"

On cross-examination it was brought out that Mr. Revill could not state the exact words used by Dr. Freas in communicating to him his desire to have Mrs. Dickson get the contents of the lock box. He had explained the entire situation, and especially that it was an effort for Dr. Freas to talk but by propounding questions to Dr. Freas and the answers he received, he testified that he learned the wishes of Dr. Freas. He repeatedly stated that he got the definite impression of what Dr. Freas wanted, and that he prepared the necessary instrument as an authorization for Mrs. Dickson to take possession of the contents of the lock box and delivered the same to her.

The principal contention made throughout this litigation by appellant is that under the undisputed facts, a gift causa mortis was not completed to Mrs. Dickson of the contents of the lock box; that certain essential elements were lacking to constitute a completed gift causa mortis.

We think the leading case in this state dealing with the question of a gift causa mortis is Scott v. Union & Planters' Bank & Trust Co., 123 Tenn., 258, 130 S. W., 757, 761. The opinion in this case was delivered by former Chief Justice Beard, and the learned Chief Justice set out in the opinion with considerable detail the facts and history and incidents out of which that controversy grew. We find in many respects that the facts of that case are quite similar to the facts of the present case and numerous authorities are cited and discussed, which bear upon the conditions essential to constitute a gift causa mortis. In that case we find this definition of a gift causa mortis: "A donation causa mortis is a gift absolute in form made by the donor in anticipation of a speedy death, and intended to take effect and operate as a transfer of the title upon, and only upon, the happening of the donor's death. Between the time when the gift

is made and the article donated is delivered and the time when the donor died, the donation is wholly inchoate and conditional."

Among other authorities cited and discussed in Scott v. Union & Planters' Bank & Trust Co., supra, is the case of Marshall v. Russell, 93 Tenn., 261, 25 S. W., 1070, in which it is said: "If the delivery to the third person is simply for the purpose of delivery to the donee as agent or messenger of the donor, the gift is not complete until the subject of the gift is actually delivered to the donee. . . . When the delivery to a third person is to him in the capacity of trustee of the donee, and not as agent of the donor, such delivery completes the gift. To constitute such a case the circumstances should show a full relinquishment of dominion over the property to the trustee for the purpose of the trust, say that the trustee shall not be the agent of the donor, but shall act for the donee instead."

To the same effect are numerous cases cited by the learned writer of the opinion in Scott v. Union & Planters' Bank & Trust Co., supra. Balling v. Manhattan Sav. Bank & Trust Co., 110 Tenn., 288, 75 S. W., 1051; Sheegog v. Perkins, 4 Baxt., 273; Shugart v. Shugart, 111 Tenn., 179, 76 S. W., 821, 102 Am. St. Rep., 777.

In the case of Scott v. Union & Planters' Bank & Trust Co., supra, the contention was made that "delivery is only evidence of the gift, and this may be shown quite as conclusively in other ways. It may arise by implication."

With respect to this contention the court said: "So far as our examination extends, the proposition, thus broadly stated, is not sound. It is true that, in Gass v. Simpson, 4 Cold., 288, it is said 'delivery strengthens the evidence of the gift,' and in other cases expressions are found like the following: 'Delivery emphasizes the gift' yet all agree that 'delivery is essential to the gift.' "

The court then quotes from Cochran v. Moore, 25 Q. B. D., 57, wherein the master of the roll said: "Upon long consideration, I have come to the conclusion that actual delivery in the case of a 'gift' is more than evidence of the existence of the proposition of law which constitutes a gift, and I have come to the conclusion that it is a part of the proposition itself."

However as stated in Scott v. Union & Planters' Bank & Trust Co., supra, the question of law remains: "What is delivery? Is it manual tradition alone, or will the law be satisfied with a symbolical, or, using a word of broader meaning, constructive, delivery?"

The court then proceeds with the further statement: "This court has had occasion a number of times to consider the elements essential in the matter of 'delivery.' In Farrar v. Bridges, 5 Humph., 411, 42 Am. Dec. 439, it is said that 'a formal ceremonious delivery of a deed is not essential to its validity, if no condition be annexed. If nothing remains to be performed in order to give effect to the instrument, its signing and sealing and attestation, as a valid instru-

ment between the parties, will make it complete and effectual, although the instrument may be left in possession of the bargainor or grantor.' ''

After citing and discussing numerous authorities bearing on this question, the court announced this rule, that where there was no evidence of fraud in procuring the gift the question of the intention of the donor enters materially into the question of delivery and in support of the statement quotes with approval from the case of Murphy v. Bordwell, 83 Minn., 54, 85 N. W., 915, 52 L. R. A., 849, 85 Am. St. Rep., 454, wherein it was said : ''While it is true that a promise or intention to make a gift in the future without act to effectuate will not constitute a donation, yet any substantial act upon the part of the owner of the property, tending to carry the gift into effect and give the donee dominion over the property, so she can appropriate it to her use, will, in the absence of such fraud, support such gift.'' Citing numerous authorities in support of this rule.

As stated in the former opinion by this court on the former appeal, after a careful consideration of all the testimony of the several highly reputable witnesses, we think it clear that Dr. Freas having suffered disappointments at the hands of his blood kin and relatives, definitely decided that he did not want them to receive any part of his estate. And as further stated in the former opinion, we think that the evidence is clear and unequivocal that Dr. Freas had become very much attached to Mrs. Dickson since she had been especially kind and considerate of him, and he desired to make substantial provision for her after his death. She was a lady past middle age and a widow; her numerous acts of kindness and consideration extended to Dr. Freas resulted in a feeling of deep gratitude to her. He felt no moral or other obligations to have his relatives share in his estate. Numerous witnesses testified, as hereinbefore stated, to conversations which they had with Dr. Freas while he was an inmate of the Sunshine Home and wherein Dr. Freas expressed his appreciation for the kindness extended him by Mrs. Dickson, and stated to these witnesses that he desired that she have his property at his death. In fact, there is no evidence to the contrary. We find abundant reasons why Dr. Freas would want Mrs. Dickson to become the beneficiary of all the property he should have at the death of Dr. Freas, and there are substantial reasons why he did not feel under any obligations to his relatives. This feeling found expression on numerous occasions as testified to by reputable witnesses.

We think it also clear from the record that Dr. Freas realized that he was in a very serious condition and that he had but little, if any, hope of recovering from his injuries. He had entrusted with Mrs. Dickson the keeping of the key to his lock box at the bank. We think that the evidence when considered in the light of all the circumstances surrounding his condition at the time he sent for his

friend, an officer of the Union Planters National Bank & Trust Company, to come to the hospital to see him, that he then had in mind the sole purpose of having the contents of his lock box delivered to Mrs. Dickson as a gift. He did not dictate the instrument authorizing the bank to turn over the contents of the lock box to Mrs. Dickson. He merely requested of Mr. Revill that the contents of the box be turned over to Mrs. Dickson. It was Mr. Revill who suggested that a written authorization would have to be given and he then proposed to prepare the authorization. Mr. Revill prepared the authorization from a printed form that was generally used in similar situations.

There is not any doubt but that Dr. Freas intended that the contents of the lock box be turned over to Mrs. Dickson. He may have had in mind that it would be necessary for him to endorse the securities contained in the box in order to complete the gift to Mrs. Dickson. This, we think, would not alter the quality of the delivery. When he directed that the lock box be turned over to Mrs. Dickson, with the clear intention to give to her its contents, and when the contents were delivered to her, the delivery became complete and that it constituted a completed gift causa mortis.

Even if it be conceded that Dr. Freas intended that the contents of the lock box be delivered to him by Mrs. Dickson, the fact remains that it was only for the purpose of making such endorsements on the securities as he thought necessary and essential to complete the gift. In this he was mistaken. However, we do not find that the evidence preponderates in favor of the contention that Dr. Freas intended that these documents be brought to him by Mrs. Dickson. We do not attach any significance whatever to the form of the authorization signed by Dr. Freas, since he understood and knew that its sole purpose and the sole office of the authorization was to place the contents of the lock box into the hands of Mrs. Dickson.

We are therefore of the opinion that the evidence is clear and convincing that Dr. Freas intended to and did give to Mrs. Dickson the contents of the lock box and completed the gift by delivery of the same to her. The delivery may be either manual or constructive. In the present case Dr. Freas could not physically go to the bank and procure the contents of the box and make a manual delivery of the same to Mrs. Dickson, but he did all that he could to effectuate and complete the gift by having the contents of the box turned over to Mrs. Dickson by the bank. This thought is clearly expressed in the case of Scott v. Union & Planters' Bank & Trust Co., supra, wherein the court said: "An examination of the modern cases all show, while courts will scrutinize with care the evidence upon which gifts causa mortis are sought to be sustained, and will require in every case clear and convincing proof, yet, when it is once ascertained that it is the intention of the donor to make such a gift, and

all is done which is possible under the circumstances in the matter of delivery, the gift will be sustained.''

There are numerous assignments of error challenging the action of the court in declining to give certain special requests tendered by the complainant to be given in charge to the jury. We have carefully examined these special requests so tendered and compared the same with the general charge of the court to the jury, and find that where the special requests so tendered contained a sound statement of the law, that the same had been sufficiently covered by the general charge.

Several of the assignments of error are directed to portions of the general charge of the court to the jury. We have carefully examined the charge, and taking the charge in its entirety we do not find that it is subject to the criticism made by appellant. To the contrary, we think the charge was full, clear and free from error, and fully instructed the jury with respect to all material matters presented by the issues.

The most serious assignment of error by appellant is with respect to the competency of certain portions of the testimony of Mr. Revill and wherein it is contended that the witness was permitted to testify as to impressions and opinions, without stating the words used by Dr. Freas. However, we have carefully considered this testimony, and the facts and circumstances under which it was given and admitted by the court. Dr. Freas was so situated and in such a condition that he could not talk very much and it was necessary for Mr. Revill to propound questions, and the replies, while broken and hardly susceptible of being recorded, yet they were sufficient to give to Mr. Revill a definite impression and understanding of the wishes of Dr. Freas. This evidence when considered in the light of all the other evidence shows that it was the clear intention of Dr. Freas that Mrs. Dickson be made the beneficiary of the gift of the contents of the lock box. We do not think that the assignments of error on this subject can be sustained. Mr. Revill did not have any personal interest or concern with respect to the matters in controversy. He was there to carry out and to do the will and bidding of Dr. Freas. He had no other interest and no other concern.

Without further burdening this opinion by a separate discussion of each of the assignments of error, we do not think they have any merit. The determinative issues were submitted to a jury and the jury was properly instructed by the court with respect to the several propositions involved, in what we consider an excellent charge. There was abundant evidence to support the verdict.

It follows that all assignments of error are overruled and the decree of the Chancellor is accordingly affirmed. The costs of the cause, including the cost of this appeal, will be paid by complainant.

Anderson and Ketchum, JJ., concur.